# Illinois Official Reports

## Appellate Court

***People v. Smith*, 2015 IL App (1st) 132176**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL SMITH, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-2176 |
| Filed | July 15, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-17000; the Hon. James Michael Obbish, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Kathleen Hill, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justice Lavin concurred in the judgment and opinion.<br>Justice Hyman dissented, with opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant Daniel Smith was convicted of aggravated unlawful use of weapon (AUUW) and was sentenced to one year of probation. Smith appeals, claiming that the State failed to establish the *corpus delicti* of the charged crime because there was no independent evidence corroborating his statements claiming ownership of the bag containing the weapon. Smith also challenges the sufficiency of the evidence claiming there was no evidence that he knowingly possessed the gun. Because we find that the State offered sufficient evidence to establish the *corpus delicti* and Smith's guilt of AUUW beyond a reasonable doubt, we affirm. We agree with the parties that the trial court erroneously assessed a $100 street gang fine because there is no evidence in the record identifying Smith as a member of a street gang when he committed the AUUW offense. Thus, we instruct the clerk of the circuit court to reduce by $100 the amount of fines originally assessed and modify the order assessing fines, fees and costs to reflect the amended total of $760.

¶ 2                                    BACKGROUND

¶ 3    On September 2, 2012, Smith was arrested at a Greyhound bus station in Chicago and was later charged with six counts of AUUW. At the time of his arrest, Smith was 19 years old and did not have a valid firearm owner's identification card. The following relevant evidence was adduced at the bench trial.

¶ 4    On September 2, James Sorrell worked as a bus driver for Greyhound on a route originating in St. Louis and ending in Chicago. At a scheduled stop in Markham, Sorrell assisted passengers exiting the bus at that stop unload their bags from underneath the bus. Smith was the only passenger boarding the bus at Markham. Sorrell verified Smith's bus ticket outside before they both boarded the bus–Smith first, followed by Sorrell. Sorrell did not recall whether Smith was carrying a bag when he boarded the bus. Through the bus's rearview mirror, Sorrell saw Smith sit in the last row on the bus and the bus then departed Markham en route to Chicago.

¶ 5    At 10:30 a.m., the bus arrived at the Greyhound bus station located at 620 West Harrison Street in Chicago. After all passengers exited the bus, Sorrell conducted a "post-trip" or "sweep" where he checked the bus to ensure that no passengers remained on the bus and no personal belongings were left behind by passengers. During the inspection, Sorrell found a red and black backpack on the last aisle seat on the passenger side of the bus. The bag's zipper was unzipped, and Sorrell saw what he believed to be the butt of a stainless steel .45-caliber handgun inside the bag. Sorrell picked the bag up and carried it off the bus planning to surrender it to his supervisor because he believed it contained a gun. After Sorrell walked off the bus, Smith approached him and said the bag was his. Sorrell asked Smith what was inside the bag without revealing the bag's contents and Smith answered "nothing but a BB gun." Sorrell responded that the gun looked like a real gun and he was turning the bag in to his supervisor. The conversation then ended and Sorrell walked to his supervisor's office.

¶ 6    Sorrell informed his supervisor that he believed he found a gun on the bus and gave her the bag with the gun still inside. Sorrell's supervisor contacted Greyhound's security office regarding the possible weapon found on the bus and security officer Michael Pinzine, who was also an off-duty Chicago police officer, responded to the call. After Officer Pinzine arrived at the supervisor's office, he removed the gun from inside the bag and cleared the gun of

ammunition. Officer Pinzine asked Sorrell where the passenger who owned the bag was and Sorrell responded that Smith was still standing by the bus.

¶ 7    Officer Pinzine elaborated that after he looked inside the bag, he saw the word "Ruger"–the name of a gun manufacturer–on the side of the gun. Officer Pinzine described the handgun as a semiautomatic, bluesteel handgun that had one live round in its chamber. After Sorrell identified Smith as the passenger claiming to own the bag, Officer Pinzine approached Smith, who was outside sitting by a garbage can next to where buses pull into the station. Officer Pinzine identified himself as a Chicago police officer, placed Smith under arrest and took him to the security office while waiting for on-duty police officers to arrive. The parties stipulated that Smith was under the age of 21 at the time of his arrest. The State then rested.

¶ 8    Smith moved for a directed finding asserting that the State offered his statement claiming to own the bag with the gun inside as the only evidence connecting him to the bag and gun, which was insufficient evidence to convict him. The trial court denied the motion and Smith testified on his own behalf.

¶ 9    According to Smith, he boarded the bus at Markham with a single camouflage duffel bag about three feet in length and kept the bag on his lap the entire bus ride from Markham to Chicago. Smith stated that the bus was about full and he sat in the fourth or fifth row, but not in the last row. Smith saw the bag "that everyone is talking about" as soon as he boarded the bus because it was on a platform area at the front of the bus. Smith noticed the bag but had nothing to do with it, and he remained in his seat the entire bus ride to Chicago.

¶ 10    When the bus arrived in Chicago, Smith exited the bus with his one camouflage bag. After he was off the bus, Smith saw a huddle of three bus drivers–including Sorrell–standing in a circle all looking inside a bag. Smith approached the huddle because he was "being nosy" and told the group "that bag looks like a bag that I have." Smith testified that he did not have the bag with him at that time, but he had a bag at home that was similar to the bag the group was discussing.

¶ 11    Smith further testified that Sorrell then showed him the gun and asked him, "What is this?" Smith answered that it looked like a BB gun. Sorrell informed him that if the bag was his, he needed to go inside to claim it. Smith shook his head and said "it's not my bag." Smith then sat on his bag located near a garbage can. Shortly thereafter, Officer Pinzine approached him, handcuffed him and searched him, finding his bus ticket. Officer Pinzine took Smith to an office inside the bus station and emptied the bag, showing its contents to Smith, who claimed to see a state identification card belonging to someone else, another bus ticket and mail belonging to someone else.

¶ 12    The defense rested and the State called Officer Pinzine in rebuttal. Officer Pinzine testified that he did not find an identification card belonging to another individual inside the bag. Officer Pinzine did find a piece of mail inside the bag, but he did not believe he showed it to Smith. According to Officer Pinzine, neither he nor his partner emptied the contents of the bag in front of Smith.

¶ 13    At the close of evidence and argument, the trial court found Smith guilty of one count of AUUW–that he knowingly carried a firearm in a vehicle and was under 21 years of age when he was in possession of the firearm. 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2012). The trial court explained that Sorrell's testimony was "very credible," but the same could not be said about Smith's testimony. The trial court elaborated that "Smith's testimony sadly was not credible at all compared to the testimony of Sorrell. *** Smith's statements really defy

common sense," and the court found it unlikely that he would have made the statements he claimed to have made to the group inspecting the backpack. Because there was only one gun, the trial court stated that there would only be one guilty finding.

¶ 14     Smith filed a motion for acquittal or in the alternative a new trial, asserting that the State failed to prove him guilty beyond a reasonable doubt and the *corpus delicti* of the crime because the State only offered as evidence his confession that he owned the bag containing the gun, which was not independently corroborated with any additional evidence establishing actual or constructive possession. The trial court denied Smith's motion reasoning that the *corpus delicti* was the actual gun recovered from the bag. The trial court sentenced Smith to one year of probation and assessed fines, fees and costs totaling $860, which included a $100 street gang fine. Smith timely appealed.

¶ 15                                    ANALYSIS
¶ 16                               A. *Corpus Delicti*
¶ 17     Smith claims that the State failed to prove the *corpus delicti* of AUUW because it offered no proof that a crime was committed independent of his alleged confession. Smith also contends that the State offered no independent corroborating evidence connecting him to the gun and the State is prohibited from relying only on his confession as evidence to prove the commission of AUUW.

¶ 18     Simply stated, the *corpus delicti* of an offense is the commission of a crime. *People v. Lara*, 2012 IL 112370, ¶ 17. In criminal proceedings, the State must prove beyond a reasonable doubt the following two propositions: (1) a crime was committed, the *corpus delicti*, and (2) the identity of the person who committed the crime. *Id*. Generally, the State cannot prove the *corpus delicti* solely through the defendant's admission, confession or out-of-court statement and must also provide independent corroborating evidence. *Id*. The independent corroborating evidence need only *tend* to prove, generally, the commission of an offense. Moreover, the independent corroborating evidence is not required to be identical to the details of the defendant's admission; instead, only some consistency between the two is required tending to confirm and strengthen the defendant's admission. *Id*. ¶ 42. Sufficient corroboration exists where the evidence tends to connect the defendant with the crime. *Id*. ¶ 44.

¶ 19     Here, through Sorrell's and Officer Pinzine's testimony, the State offered sufficient corroborating evidence–independent of Smith's statements to Sorrell–tending to prove the commission of AUUW, which requires knowing possession of a weapon by an individual under 21 years of age. 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2012). Sorrell testified that he found a bag on the bus with an object inside he believed to be a gun, and Officer Pinzine's testimony confirmed that the object in the bag was a semiautomatic gun with a live round in its chamber. Both Sorrell's and Officer Pinzine's testimony established the existence of a gun on the bus. Sorrell's testimony also demonstrated Smith's connection to the offense because he observed Smith sit in the last seat on the bus, which was the same area where he personally found the bag with the gun. Collectively, Sorrell's and Officer Pinzine's testimony was independent evidence tending to inspire belief in Smith's admission that he owned the bag containing the gun that was found on the bus. See *People v. Hannah*, 2013 IL App (1st) 111660, ¶¶ 29, 31 (noting "slight level of evidence necessary to establish *corpus delicti*," court found State established offense of unlawful possession of a weapon by a felon through the recovered handgun coupled with the location where it was recovered and the defendant's

confession); *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 22 ("[W]e reject the defendant's contention that consideration of his statement regarding the need for a gun would violate the *corpus delicti* rule. The recovery of the revolver from above the kitchen cabinet constituted sufficient evidence to corroborate his incriminating statement."). Moreover, because Smith was under 21 years of age, his possession of a gun was unlawful.

¶ 20    *People v. Lueder*, 3 Ill. 2d 487 (1954), cited by Smith as support for his claim that there was no proof of *corpus delicti*, is inapposite. *Lueder* reversed a conviction finding the *corpus delicti* had not been proved because there was no evidence independent of the defendant's confession that someone willfully burned down a building in a cemetery where he worked. *Id.* at 489. The only evidence independent of the defendant's confession were the facts that the building was burned and defendant worked at the cemetery. *Id.* Smith asserts *Lueder* is analogous because the State only established that a gun was found on the bus, which was not inherently illegal, but failed to establish that Smith was connected to the gun, which would then make possession of the weapon unlawful. We disagree. In *Lueder*, the court found no independent evidence tending to show the *willful* burning of a building, which was a required element to establish the commission of the crime. *Id.* at 489-90. In contrast, apart from the obvious difference in the nature of the offenses at issue in the cases, the evidence here demonstrated that Smith, who was not 21 years of age, sat on the bus in close proximity to where a gun was found, which tended to show the commission of AUUW. Thus, *Lueder* is readily distinguishable.

¶ 21    We are mindful that only a "slight level of evidence [is] necessary to establish the *corpus delicti*," and we find that the State met that minimal threshold. *Hannah*, 2013 IL App (1st) 111660, ¶ 29; see *Lara*, 2012 IL 112370, ¶ 45 (recognizing that "far less independent evidence" is required to corroborate a defendant's confession than to prove the defendant's guilt beyond a reasonable doubt). The State offered sufficient independent evidence mainly through Sorrell's testimony that adequately corroborated Smith's confession claiming ownership of the bag containing the gun, which proved the *corpus delicti* of AUUW.

¶ 22                              B. Reasonable Doubt
¶ 23    In a similar claim, Smith next argues that the State failed to prove him guilty of AUUW beyond a reasonable doubt because the State offered no evidence establishing that he knowingly possessed the gun recovered from the bus. Specifically, Smith claims that the State offered no physical evidence connecting him to the bag with the gun inside and offered no testimony that anyone saw him carrying the bag or gun. As noted, the parties stipulated that Smith was born on October 28, 1992, which satisfies the aggravating factor that he was under 21 years of age when he possessed the gun. Thus, consideration of that aggravating factor is not at issue here.

¶ 24    Where a criminal conviction is challenged based on the sufficiency of the evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Austin M.*, 2012 IL 111194, ¶ 107. This standard of review applies in all criminal cases regardless of whether the evidence is direct or circumstantial. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). A defendant may be convicted based entirely on circumstantial evidence provided that evidence establishes the elements of the crime beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). We will

reverse a conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory" as to create a reasonable doubt of the defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 25    To sustain a conviction for AUUW, the State must prove that the defendant knowingly "[c]arries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land *** any pistol, revolver, stun gun or taser or other firearm," and the person possessing the weapon, who was not engaged in lawful activities prescribed under the Wildlife Code (520 ILCS 5/1.1 *et seq.* (West 2012)), was under 21 years of age. 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2012). Knowledge and possession are factual questions resolved by the trier of fact, and a reviewing court will not disturb those findings "unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of guilt." *People v. Luckett*, 273 Ill. App. 3d 1023, 1033 (1995).

¶ 26    " 'Knowing possession' may be either actual or constructive." *People v. Brown*, 327 Ill. App. 3d 816, 824 (2002). In this case, the gun was not recovered from Smith's actual possession; thus, we must determine whether the State offered sufficient evidence that Smith constructively possessed the weapon. *Hannah*, 2013 IL App (1st) 111660, ¶ 28; *Spencer*, 2012 IL App (1st) 102094, ¶ 17. The State establishes constructive possession by demonstrating that the defendant: (1) knew of the weapon's presence and (2) exercised control over the area where the weapon was found. *People v. Hunter*, 2013 IL 114100, ¶ 19; *Hannah*, 2013 IL App (1st) 111660, ¶ 28. Knowledge is usually established by circumstantial evidence because it is rarely shown by direct proof. *People v. Fleming*, 2013 IL App (1st) 120386, ¶ 74. In fact, constructive possession is typically proved entirely through circumstantial evidence. *People v. Besz*, 345 Ill. App. 3d 50, 59 (2003). The State may prove the knowledge element by offering evidence regarding the defendant's acts, statements or conduct from which a fact finder may infer that the defendant knew of the weapon's presence. *Fleming*, 2013 IL App (1st) 120386, ¶ 75. The State proves the control element by demonstrating that the defendant had the " 'intent and capability to maintain control and dominion' over an item, even if he lacks personal present dominion over it." *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)).

¶ 27    Here, the State offered sufficient circumstantial evidence for a rational trier of fact to conclude that Smith had constructive possession of the gun. Contrary to Smith's claim, his statements to Sorrell were not the only evidence the State offered at trial. Again, the State offered Sorrell's testimony establishing that he found an unzipped bag with what appeared to be the butt of a stainless steel .45-caliber handgun inside the bag, which was later confirmed by Officer Pinzine to be a loaded gun. The parties do not dispute that Smith was on the bus and exited the bus at the last stop in Chicago nor is there any dispute that Smith approached Sorrell after he exited the bus. Although he described a different bag, Smith himself testified that he carried a bag onto the bus, which he kept on his lap for the duration of the ride. We consider Smith approaching Sorrell shortly after Sorrell exited the bus while Sorrell held the bag in his hand significant because contrary to Smith's version of events, it supports the reasonable inference that Smith recognized the bag as his and wanted Sorrell to return the bag to him. This, in turn, creates the reasonable inference that Smith intended to regain control over the bag, which he possessed while on the bus. Moreover, the location where Sorrell found the bag–in the last row where he observed Smith sit–is also significant because the trier of fact could reasonably infer that while Smith rode the bus as a passenger, the gun was immediately

accessible to him inside the unzipped bag. See *People v. Grant*, 339 Ill. App. 3d 792, 799 (2003) (testimony that the defendant reached back and put something on the seat of a vehicle creates a reasonable inference that the defendant had knowledge of the gun and that the gun was in his immediate and exclusive control when the gun was found on that same seat).

¶ 28    Furthermore, Smith's statement that nothing was inside the bag but a BB gun also creates a reasonable inference of "knowing possession" because that statement–made without being shown the actual contents of the bag–implies he knew that a gun was inside the bag. See *People v. Phillips*, 215 Ill. 2d 554, 576 (2005) (once corroborated, a defendant's statement may be considered along with the corroborating evidence to determine whether the defendant committed the offense beyond a reasonable doubt). Smith's statement also creates a reasonable inference that he intended to regain control and possession of his bag and gun because his explanation that the object was "nothing" but a BB gun sought to diminish the importance of the object in the hope that Sorrell would relinquish the bag to him. We consider Smith's claim that the evidence was insufficient because the State offered no testimony establishing that he boarded the bus with the bag and that there was no identification in the bag belonging to him irrelevant in light of the other circumstantial evidence the State offered proving his knowing possession of the gun. Likewise, the presence of other individuals on the bus does not defeat Smith's constructive possession of the gun. See *People v. Ingram*, 389 Ill. App. 3d 897, 901 (2009) (concluding that another passenger's accessibility to a gun in a vehicle does not preclude a finding that the defendant possessed the gun).

¶ 29    Moreover, it is apparent from the record that the trial court's determination of Smith's guilt turned on the credibility of the witnesses. Specifically, the trial court expressly commented on Smith's credibility noting that his testimony "sadly was not credible at all compared to the testimony of Sorrell" and his explanation regarding his statements to Sorrell "really def[ies] common sense." As a court of review, we may not substitute our judgment for that of the fact finder regarding the credibility of witnesses because it is the trier of fact's responsibility to fairly resolve conflicts in testimony. *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 53; *Campbell*, 146 Ill. 2d at 375; *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). Consequently, we find no reason to substitute our judgment for the trial court's determination of the witnesses' credibility, especially because the record reveals that the trial court was aware of and considered the inconsistencies in the witnesses' testimony. *People v. Fox*, 337 Ill. App. 3d 477, 481 (2003).

¶ 30    In reaching the conclusion that the circumstantial evidence was "unreasonable, improbable, and unsatisfactory," our dissenting colleague substitutes his judgment for the experienced trial judge. *Infra* ¶ 60. But black letter law holds that it is not our function to retry the defendant when considering the sufficiency of the evidence. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Our colleague reassesses the credibility of both Smith's and Sorrell's testimony (without ever having had the opportunity to observe either) by deeming Sorrell's conversation with Smith to be of a questionable nature (*infra* ¶ 44) and finding Smith's testimony that he told Sorrell he had a similar bag at home to be believable (*infra* ¶ 52). This is a classic credibility determination that belongs to the trier of fact. We find nothing improbable, unconvincing or contrary to human experience in Sorrell's testimony that Smith approached him and asked for his bag back. *People v. Kidd*, 2014 IL App (1st) 112854, ¶¶ 29-30. Indeed, we find it likely that 19-year-old Smith believed he could approach Sorrell, explain that he had

left the bag on the bus and ask for it back, particularly since Smith would have had no way of knowing that Sorrell was aware of the gun in the bag.

¶ 31 In contrast, in order to credit Smith's version of events, we would have to believe that a group of adult Greyhound employees, having ascertained the presence of a weapon in the bag, would solicit the opinion of a teenage stranger by showing him the weapon and asking what he thought it was. Further, we would have to accept that a trained police officer would empty the bag containing the weapon in front of Smith. We are unwilling to indulge such improbabilities in order to reverse.

¶ 32 Considering all of the evidence in the light most favorable to the State, a rational trier of fact could have found the elements of AUUW beyond a reasonable doubt. Thus, we affirm Smith's conviction because the evidence was not so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of Smith's guilt.

¶ 33                                     C. Street Gang Fine

¶ 34 Finally, Smith contends, and the State concedes, that the trial court erroneously assessed a $100 street gang fine, which is imposed on defendants who at the time of committing a criminal offense are members of a street gang. 730 ILCS 5/5-9-1.19 (West 2012). The State acknowledges that the trial court erred in imposing the fine because there was no evidence proving Smith belonged to a street gang when he committed the AUUW offense. We agree.

¶ 35 Under Illinois Supreme Court Rule 615(b)(4), this court has the authority to order the circuit court clerk to make necessary corrections without remand. *People v. McCray*, 273 Ill. App. 3d 396, 403 (1995). Accordingly, we instruct the circuit court clerk to amend the fines, fees, and costs order to reflect the $100 reduction in fines for a corrected total amount of fines, fees, and costs of $760.

¶ 36 The judgment of the trial court is affirmed; the fines, fees, and costs order amended to reflect a total of $760 in fines, fees, and costs.

¶ 37 Affirmed as modified.

¶ 38 JUSTICE HYMAN, dissenting.

¶ 39 While circumstantial evidence may provide the basis for a conviction (*Pollock*, 202 Ill. 2d at 217) and the trier of fact determines the credibility of witnesses and weighs the evidence, it remains the duty of this court to review the evidence and, if it is improbable, unsatisfactory, or unconvincing to establish a defendant's guilt beyond a reasonable doubt, to reverse the conviction. Review of the evidence here reveals that it is too improbable, unsatisfactory, and unconvincing to establish Smith's constructive possession of the gun beyond a reasonable doubt. I believe the majority's opinion stretches the concept of reasonable inferences beyond the breaking point. Therefore, I respectfully dissent.

¶ 40 "It is well established that, to warrant conviction of a crime on circumstantial evidence, the proof must be of a conclusive nature and tendency, leading on a whole to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. [Citation.]" *People v. Howard*, 74 Ill. App. 3d 870, 875 (1979). Moreover, where, as here, the State's case is circumstantial, "proof beyond a reasonable doubt requires the exclusion of every reasonable hypothesis, based on the evidence or on the absence

of evidence, which is consistent with defendant's innocence." (Internal quotation marks omitted.) *Id.*

¶ 41    Factual inferences inform the State's evidence against Smith. Inferences themselves, however, do not amount to evidence–inferences are the result of reasoning from the evidence. *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004) (the guilty finding may be supported not only by the evidence, but also by any reasonable inferences that may be drawn from the evidence). Due process requires an inference involving (1) a rational connection between a proven fact and the presumed fact; (2) in which the presumed fact more likely than not flows from the proven fact; and (3) corroborating evidence of guilt that supports the inference. *People v. Funches*, 212 Ill. 2d 334, 342-43 (2004) (addressing limits on federal and state legislatures' power to "make the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated" (internal quotation marks omitted)); see *People v. Pomykala*, 203 Ill. 2d 198, 203 (2003) (inference rests " 'on the strength of the connection between the elemental or ultimate fact presumed or inferred and the basic or evidentiary fact' " (quoting *People v. Hester*, 131 Ill. 2d 91, 98 (1989))). If there is no corroborating evidence, the "leap from the prove[n] fact to the presumed [fact] must still be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *Hester*, 131 Ill. 2d at 100.

¶ 42    Evidentiary facts must justify an inference of probability as opposed to possibility, conjecture, and speculation. See *Salinas v. Werton*, 161 Ill. App. 3d 510, 515 (1987); *Consolino v. Thompson*, 127 Ill. App. 3d 31, 33 (1984) (in product liability context). Possibility, along with conjecture and speculation, contains uncertainty and for that reason cannot support the finding of the ultimate facts required to support a conviction. See *People v. Chew*, 45 Ill. App. 3d 1024, 1028 (1977) (in drawing inference, fact finder must not "abandon[ ] the domain of allowable inferences or enter the area of speculation"). The fact finder may draw an inference in its discretion, but is not required to do so as a matter of law. *Funches*, 212 Ill. 2d at 340. Thus, even though the vital role of inferences in the expeditious resolution of factual questions has been recognized in criminal cases, an inference "must not invade the territory of the fact finder to determine the existence of the ultimate or elemental fact beyond a reasonable doubt. [Citation.]" *Hester*, 131 Ill. 2d at 98-99; *Funches*, 212 Ill. 2d at 342 (quoting *County Court v. Allen*, 442 U.S. 140, 156 (1979)).

¶ 43    Here, the State did not introduce into evidence the bag, the piece of mail, or the gun. Pinzine mentioned finding a piece of mail in the bag, but this intriguing information was not developed further. The State did not present testimony that the police ran a gun trace or attempted to get fingerprints from the gun, even though fingerprints are routinely taken from firearms. Where a party fails to present evidence in its possession, an inference attaches that the evidence would have been unfavorable to it (see, *e.g.*, *People v. Strong*, 21 Ill. 2d 320, 325 (1961) (holding that while the State was not obligated to produce a government informant witness, the unexplained failure to do so may give rise to an inference against the State)). A party should not benefit from an evidentiary vacuum of its own doing through a favorable inference.

¶ 44    The pivotal corroborating evidence comes from the testimony of Sorrell placing Smith in the last seat on the bus where he found the bag. I am mindful that the trial court found that Sorrell's testimony was credible and that Smith's was not. But what emerges from a close examination of Sorrell's testimony renders the inferences drawn unsound. Sorrell testified that his route was St. Louis to Chicago with a two- to three-minute stopover in Markham. Some

passengers got off that bus and Sorrell helped them get their bags. Smith was the only passenger who boarded in Markham. Sorrell testified that he had a 20- to 30-second interaction with Smith while checking Smith's ticket as Smith boarded the bus. Sorrell got on the bus after Smith boarded, and he watched Smith in the rearview mirror as he went to the last seat. Sorrell did not remember seeing Smith with any bag, but did remember that Smith had not checked any bags. The bus held 55 passengers but Sorrell could not recall how many passengers were on the bus that day.

¶ 45 About five minutes after all passengers debarked in Chicago, Sorrell checked the bus for personal belongings left behind. Sorrell found the bag on the last seat. He described it as an average size red and black backpack; it was unzipped so that its contents were visible. He saw a "butt of a weapon" that he described as a handgun. Sorrell picked up the bag from the seat to take it to his supervisor. At this point, Smith approached and according to Sorrell, told him that the bag was his. On direct examination, Sorrell was asked: "Did you say anything to him when he said that to you?" Sorrell answered: "I asked him what was in the bag." Smith answered it was "nothing but a BB gun." On cross-examination, Sorrell stated that he did not take the gun out of the bag and show Smith the weapon.

¶ 46 Pinzine testified that he responded to Sorrell's supervisor's call for security. Pinzine stated that the bag was open and he saw the gun inside the bag. Pinzine searched the bag, unloaded the gun and then arrested Smith who was still standing near the bus. About five minutes passed between Pinzine's arrival and Smith's arrest. Pinzine described the bag as a "black messenger bag/fanny pack." He searched the bag "very briefly" and did not recall anything that "popped out." He did, however, remember that he found "a piece of mail and I don't believe I showed it to defendant though." On cross-examination, Pinzine stated that Sorrell told him that Sorrell showed the gun to Smith and then asked Smith what it was.

¶ 47 Smith testified that after he got off the bus he approached the bus driver who was standing with some coworkers: "they were standing like in a circle with the bag in hand, open, just everybody just looking in it, so I approached and I looked. I was being nosy. I wanted to see what was going on." Smith then stated: "I said, 'That bag looks like a bag that I have' and I didn't have it with me. I had a bag at home just that was similar to the bag." The bus driver asked, " 'What is this?' And he showed me the gun inside of the bag." Smith did not claim that the bag was his.

¶ 48 Smith's testimony differed from the State's witnesses in that Smith stated that he sat in the fourth or fifth seat, not the last row; he had only a camouflage duffle bag that he held on his lap; and, when he got off the bus in Chicago, he saw some people in a "huddle" around a backpack. He approached them, remarking that the bag looked like a bag he had at home. The bag was open and he stated that what he saw looked like a BB gun.

¶ 49 The majority believes that Smith's approaching Sorrell supports an inference that "Smith recognized the bag as his and wanted Sorrell to return the bag to him." *Supra* ¶ 27. The majority then infers that Smith wanted to "regain control over the bag, which he possessed while on the bus." *Id*. The question arises: if Smith actually was carrying a loaded gun in a bag, would he approach a bus driver holding that bag and claim ownership? To infer that Smith would be so bold as to think that the bus driver would simply hand a bag with a gun to him does not constitute a reasonable inference.

¶ 50 The majority posits that "in order to credit Smith's version of events, we would have to believe that a group of adult Greyhound employees, having ascertained the presence of a

weapon in the bag, would solicit the opinion of a teenage stranger by showing him the weapon and asking what he thought it was." *Supra* ¶ 31. Sorrell stated during direct examination that he asked Smith what was in the bag only after Smith approached him. On cross-examination, Sorrell denied showing Smith the gun. But Pinzine testified that Sorrell told Pinzine that he showed the gun to Smith and then asked him what it was. In any case, the majority characterizes the exchange between Smith and Sorrell as "solicit[ing] the opinion" of a young stranger. Neither Sorrell, Pinzine, nor Smith testified that anyone "solicited" an opinion; rather, Sorrell and Smith both stated that Smith approached Sorrell and initiated a conversation. Pinzine, who only interacted with Smith during his arrest, related what Sorrell told him at the time.

¶ 51    The majority also posits that, to believe Smith's version, "we would have to accept that a trained police officer would empty the bag containing the weapon in front of Smith." Smith testified that he was handcuffed and brought into the security office in the police station. The security guard then "pulled everything out and set it down."

¶ 52    Further, Sorrell testified that he was able to see Smith outside near the buses because there was a "big glass window" in the office; it follows that Smith was also able to see what was happening in the office, *i.e.*, Pinzine's arrival, search of the bag, and unloading the gun. Is it logical that Smith would remain in the immediate area for some five minutes and smoke a cigarette knowing that the bag with a loaded gun had been brought into the supervisor's office? Thus, the only rational inference that can be drawn from this testimony is that Smith had no connection to the bag other than as he testified: he had a similar bag at home and the gun, to him, looked like a BB gun.

¶ 53    The majority, relying on *Phillips*, 215 Ill. 2d at 576, infers Smith's guilty knowledge from his having made the statement that nothing was inside the bag but a BB gun "without being shown the actual contents of the bag." *Supra* ¶ 28. But, a review of the record indicates that, while Sorrell testified that he did not take the gun out of the bag or show Smith the gun, he also testified that he had the bag in his hand with the handle of the gun sticking out when Smith approached him. Significantly, Sorrell did not state that at any point he closed the bag and Pinzine stated the bag was open and he could see the gun. It follows that it must have been unzipped with the handle of the gun in plain view when Smith approached.

¶ 54    Whether the bag was in Sorrell's hand, as stated by Sorrell, or on the ground, as stated by Smith, is irrelevant. Highly relevant, however, is that the evidence does not support the conclusion that Smith never saw the gun, a conclusion from which the majority leaps to "knowing possession." *Supra* ¶ 28.

¶ 55    The majority also infers that by calling the gun a BB gun Smith "sought to diminish the importance of the object in the hope that Sorrell would relinquish the bag to him." *Supra* ¶ 28. There is much room for reasonable disagreement with this so-called inference, which in my view, constitutes nothing more than merely conjecture and a conclusion drawn on hindsight, not a reasonable inference. Again, basing inferences on subjective judgments about what an individual may or may not have intended easily can lead to a spurious conclusion. Unfortunately for Smith, the majority has made that subjective judgment about Smith's personality and motivation by inferring an ulterior purpose for Smith's BB gun comment.

¶ 56    Further, relying on *Grant*, 339 Ill. App. 3d at 799, the majority concludes that the location where Sorrell found the bag supports an inference that the gun was immediately accessible to Smith while he was a passenger. *Supra* ¶ 27. Before addressing *Grant*, which is distinguishable

on its facts, it is worth observing that nothing in the record indicates that Sorrell checked the backseat while unloading passengers in Markham. Nor did Sorrell testify to seeing the bag on the seat when he saw Smith in the rearview mirror. It is equally reasonable, therefore, to infer that the bag was there when Smith got on the bus, and Sorrell misheard Smith when Smith approached him about the bag. Presence at the scene of an offense is insufficient, without more, to establish guilt beyond a reasonable doubt; opportunity alone is not sufficient to sustain a conviction where the prosecution is unable to show who committed the crime, unless it can also show that no one else had the opportunity to commit the offense. *People v. Howard*, 74 Ill. App. 3d 870, 877 (1979).

¶ 57    Unlike the facts here, in *Grant* the police officer *actually saw* the defendant reach back and put something on the seat when she asked him to get out of the car. *Grant*, 339 Ill. App. 3d at 798-99. The uncased, loaded weapon was found on the same seat, and the court inferred that the defendant had both knowledge of the gun and immediate and exclusive control. *Id*. at 799. Sorrell did not remember seeing Smith carrying a bag on board. He found the bag on the last seat where he thought Smith was sitting, based on his observation in the rearview mirror at the time Smith got on the bus. Critically, Sorrell never actually saw any bag with or near Smith.

¶ 58    In addition, the majority cites *Ingram*, 389 Ill. App. 3d at 901, to support the conclusion that the presence of other passengers on the bus did not defeat Smith's constructive possession of the gun. *Supra* ¶ 28. *Ingram*, where the defendant's flight from a car and providing police with a false name, together with his accessibility to a gun found in the backseat where another passenger also had access, presented a significantly different scenario. With other passengers present and passengers disembarking in Markham and later in Chicago, any inference drawn is tenuous, at best, which does not suffice to prove Smith's control beyond a reasonable doubt.

¶ 59    In sum, contrary to the majority's conclusion of independent evidence "tending to inspire belief in Smith's admission that he owned the bag containing the gun" (*supra* ¶ 19), I find nothing in the evidence "tending to inspire belief" that the bag belonged to Smith.

¶ 60    Given the scant record, the circumstances of Sorrell's view of Smith through a rearview mirror, and his inability to recall seeing Smith with any bag, I find the circumstantial evidence on which the trial court relied so unreasonable, improbable, and unsatisfactory, that a reasonable doubt as to Smith's guilt remains.

¶ 61    Accordingly, I would reverse.